# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

### CASE NO.:

JOHN DOE M.D.Y.,

      Plaintiff,

    vs.

**TRAILS ACADEMY, LLC., TRAILS CAROLINA, LLC., TRAILS MOMENTUM A/K/A TRAILS CAROLINA, WILDERNESS TRAINING & CONSULTING, LLC D/B/A FAMILY HELP & WELLNESS, WTC HOLDCO, LLC, WTCSCL, LLC and UNNAMED ENTITIES 1-10**

      Defendants.

**COMPLAINT AND JURY DEMAND**

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, JOHN DOE M.D.Y., by and through undersigned counsel, and hereby files this complaint against Defendant Trails Momentum a/k/a Trails Carolina, Defendant Trails Academy, LLC, Defendant Trails Carolina, LLC, Defendant Wilderness Training & Consulting, LLC ("WTC") d/b/a Family Help & Wellness ("FHW"), Defendant WTC Holdco, LLC, Defendant WTCSL, LLC, Defendants Unnamed Entities 1-10 and their officers, directors, managers, employees and agents (hereinafter collectively referred to as "Defendants") and in support thereof, makes the allegations included herein.

## INTRODUCTION

1.    This action seeks to vindicate the rights of Plaintiff John Doe M.D.Y. ("John") who was coercively controlled, neglected, sexually and emotionally abused, and subjected to

1

forced labor without compensation at the hands of Trails Momentum a/k/a Trails Carolina, a for-profit program of Trails Academy, LLC and Trails Carolina, LLC, acting by and through their owner and manager Wilderness Training & Consulting, LLC ("WTC") d/b/a Family Help & Wellness ("FHW"), WTC Holdco, LLC, WTCSL, LLC, Unnamed Entities 1-10 and their officers, directors, managers, employees and agents (collectively "Trails"). As a result of the Defendants' conduct, John has experienced severe emotional distress and physical injuries.

2.      Trails Momentum a/k/a Trails Carolina is a for-profit program run by WTC, which is part of an organization of for-profit affiliated businesses that does business as Family Help & Wellness. Family Help & Wellness is based in Salem, Oregon, and it operates various "troubled" teen programs in North Carolina, Idaho, Utah, and Arizona.

3.      Family Help & Wellness advertises that young people enrolled in their program will experience "[a]dventure programming, clinical services, education, service-learning, community living, and family programming [which] are seamlessly interwoven to maximize the transference of soft and hard skills in a way the empowers our graduates in their post Trails Momentum lives."[1]

4.      Family Help & Wellness boasts that Trails is a "whole student centered growth experience."[2]

5.      Trails also claims that it has master level therapists, individualized treatment planning, school with accredited academics, and weekly family treatment planning with

---

[1] Family Help & Wellness, *Trails Momentum*, http://web.archive.org/web/20210111143005/https://famhelp.com/trails-momentum/ (archived by Wayback Machine on Jan. 22, 2021).
[2] *Id.*

"licensed, experienced" therapeutic staff[3] and that "[f]ield staff provide group and individualized safety and skill instruction."[4]

6.    Despite the façade of providing a safe and therapeutic residential and wilderness program for children and young adults, Defendants failed to screen and assess their staff, and the children and young adults in their legal custody and created an environment where children and young adults, and its staff, have and do abuse others within Defendants' custody and care. Further, Defendants failed to provide adequate medical care, food, clothing and shelter for the children and young adults in their custody.

7.    Despite employing therapists and staff, Defendants repeatedly fail to report abuse and neglect to authorities and fail to take prompt action to protect the children and young adults in its care.

8.    While Defendants tout themselves as providing extensive mental health services for their residents, including John, such services were only accessible for approximately 3 hours per week, the remainder of every day and each hour were with unqualified and inexperienced staff.

9.    Moreover, Defendants utilize policies and procedures with employed staff that contradict North Carolina law and prevent appropriate regulatory and law enforcement oversight and intervention for the protection of the residents in their care and custody.

10.    The abuse, neglect and forced labor that John was subjected to while in

---

[3] Trails Momentum Website, *Grow,*
https://web.archive.org/web/20210124192635/https://trailsmomentum.com/grow/ (archived by Wayback Machine on Jan. 22, 2021).
[4] Trails Momentum Website, *Daily Life,*
https://web.archive.org/web/20210301183410/https://trailsmomentum.com/daily-life/ (archived by Wayback Machine Jan. 24, 2021).

Defendants' custody was the foreseeable result of the Defendants' unfair business practices, negligent, reckless and wanton misconduct and corporate policy of non-compliance with industry standards or North Carolina and Oregon law.

11. Defendants knew or should have known about the abuse and neglect of others in their programs yet failed to take any corrective action to protect and safeguard future residents from harm, including John.

12. Defendants, by their corporate policies and practices, acts, failures, condonations and omissions, were directly responsible for, and created an environment that enabled John's abuse, neglect and forced labor, as well as the abuse and neglect of others who are too victimized and afraid to allow their voice to be publicly heard.

13. John has suffered severe and life-long injuries as a result of Defendants misconduct while in their custody and care.

## PARTIES

14. Plaintiff John Doe is a resident of the state of Illinois residing in Chicago.

15. Due to the sensitive, private, and potentially retaliatory nature of his allegations, John requests that this Court allow him to litigate this case using a pseudonym and files a motion to proceed in pseudonym herewith.[5]

16. Defendant Trails Carolina, LLC f/k/a/ NCWP, LLC is a manager-managed limited liability company organized and existing under the laws of the State of North Carolina since June 25, 2008. Trails Carolina, LLC's "principal office street address" is listed at 500 Winding Gap Rd., Lake Toxaway, NC 28747 in Transylvania County "principal office mailing address" is listed as 530 Center Street NE Ste 700, Salem, OR 9730. Trails Carolina, LLC's

---

[5] Notably, counsel for Defendants have already been provided John Doe's real name.

managing member is situated in Salem, Oregon. Trails Carolina, LLC is a citizen of North Carolina, Oregon, Texas, Utah, Idaho, Arizona, and Washington for the purposes of federal diversity jurisdiction.

17. Defendant Trails Academy, LLC is a manager-managed limited liability company organized and existing under the laws of the State of North Carolina since Mar. 20, 2014. Defendant Trails Academy, LLC's "principal office street address" is listed at 555 Sky Valley Camp Rd. Hendersonville, North Carolina 28739 in Henderson County and its "principal office mailing address" is listed as 530 Center Street NE Ste 700, Salem, OR 9730. Trails Academy, LLC's managing member is situated in Salem, Oregon. Trails Academy, LLC is a citizen of North Carolina, Oregon, Texas, Utah, Idaho, Arizona, and Washington for the purposes of federal diversity jurisdiction.

18. Trails Momentum (now, upon information and belief, rebranded as Momentum) A/K/A Trails Carolina is a for-profit program run, upon information and belief, by Defendant Trails Academy, LLC, Defendant Trails Carolina, LLC, and Wilderness Training & Consulting, LLC, which is part of an organization of for-profit affiliated businesses including named defendants that does business as Family Help & Wellness.

19. Wilderness Training & Consulting, LLC (hereinafter referred to as "WTC") is an Oregon limited liability company, is, per entity filings with the North Carolina Secretary of State, the managing member of both Defendant Trails Academy, LLC and Defendant Trails Carolina, LLC and does business as Family Help & Wellness. WTC lists in its recent filings with the North Carolina Secretary of State that its managing member is WTC HOLDCO, LLC – Wayne Laird.

20. Defendant WTC HOLDCO, LLC is another limited liability company existing under the laws of the State of Oregon since Aug. 15, 2017.  WTC Holdco, LLC's primary place

of business is listed as 530 Center St. NE Ste. 700, Salem, Or 97301.

21.    Upon information and belief, Trails Carolina also claims Defendant WTCSL, LLC is the sole member and manager of Wilderness Training & Consulting, LLC. Defendant WTCSL, LLC is a limited liability corporation organized and existing under the laws of the State of Oregon. WTCSL, LLC's primary place of business is listed as 530 Center St. NE Ste. 700, Salem, Or 97301.

22.    Upon information and belief, WTCSL, LLC's membership is a diverse number of individuals invested in the wilderness therapy industry in locations where Family Health and Wellness operates its various programs. Specifically, Trails Carolina claims that WTCSL, LLC members are:

23.    WTC Holdco, LLC, whose members, according to Trails Carolina, are:

24.    FHW/THP Blocker, Inc., a private equity firm formed in and maintaining its principal place of business in Texas;

25.    PGO, LLC, whose member is Sue Crowell, a citizen of North Carolina;

26.    Opal Creek Capital, LLC, whose member is Tim Dupell, a citizen of Oregon;

27.    Wayne Laird, a citizen of Oregon; and

28.    JLC Family, LLC, whose member is Johnny Deblock, a citizen of Washington;

29.    Graham Shannonhouse, a citizen of North Carolina;

30.    Kathryn Huffman, a citizen of North Carolina;

31.    Cat Jennings, a citizen of North Carolina;

32.    Dilly Bean LLC, whose sole member is Bryan Tomes, a citizen of North Carolina;

33.    John Gordon, a citizen of North Carolina;

34.    Mary S. Pierce, a citizen of North Carolina;

35. Rebecca Gebb, a citizen of North Carolina;

36. SEJC Holdings, LLC, whose sole member is Kyle Gillett, a citizen of North Carolina;

37. FNS Group, LLC, whose sole member is Dan Stuart, a citizen of Utah;

38. Ikaika Holdings LLC, whose sole member is Keoni Anderson, a citizen of Utah;

39. Randi Nelson, a citizen of Utah;

40. Jen Wilde Consulting PLLC, whose sole member is Jennifer Wilde, a citizen of Utah;

41. Laura Burt, a citizen of Utah;

42. Mahalo Nui, LLC, who sole member is Judith Jacques, a citizen of Utah;

43. Scott Hess, a citizen of Utah;

44. Shayne Gallagher, a citizen of Utah;

45. Sheri Gallagher, a citizen of Utah;

46. Jesse Long, a citizen of Oregon;

47. Hayden Dupell, a citizen of Oregon;

48. Kirsten Morgan, a citizen of Oregon;

49. Matt Roy, a citizen of Oregon;

50. Steven Stradley, a citizen of Oregon;

51. Jon Worbets, a citizen of Idaho;

52. Kathy Rex, a citizen of Idaho;

53. Reid Treadaway, a citizen of Idaho;

54. Simpson Holdings, L.C., whose two members are Jeff Simpson and Becky Simpson, who are citizens of Arizona; and

55.     White Mountain Consulting LLC, whose sole member is Josh White, a citizen of Arizona.

56.     Unnamed Entities 1 – 10 are partners, members, managing members, or subsidiaries of Defendants who worked with Trails with marketing, advertising, referrals, and provision of services, whose names will be known through discovery.

57.     Upon information and belief, collectively, Defendants were responsible for the hiring, training, and oversight of Trails' personnel, as well as adopting and enforcing policies and procedures that ensured the well-being of the minors and young adults entrusted to Trails' custody and care.

58.     Although Trails located its programs in North Carolina, it listed its principal mailing address at the offices of FHW, WTC, WTC Holdco, LLC, and WTCSL, LLC in Oregon. Upon information and belief, FHW and WTC conducted much of Trails' marketing, advertising, and enrollment activities among other administrative support.

59.     Defendants acted through their employees in a manner that resulted in John's abuse, physical neglect and forced labor during his time at Trails.

60.     Upon information and belief, Defendants were at all times relevant hereto responsible for the safety, well-being, and treatment of the Plaintiff.

61.     Upon information and belief, the wrongful acts giving rise to this complaint occurred in Henderson County, North Carolina and Marion County, Oregon.

## JURISDICTION AND VENUE

62.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and the Defendants, and the amount in controversy in this case exceeds $75,000.00, exclusive of costs and interest.

63.     Plaintiff is a citizen of Illinois.

64.     Defendant Trails Academy, LLC conducts business nationwide, including in North Carolina, Oregon, Texas, Utah, Idaho, Arizona, and Washington, and maintains its principal place of business in Henderson County, North Carolina, with a registered agent located at 160 Mine Lake Ct Ste 200, Raleigh NC, 27615. This Court has personal and specific jurisdiction over Defendant Trails as it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

65.     Defendant Trails Carolina, LLC f/k/a/ NCWP, LLC conducts business nationwide, including in Oregon Texas, Utah, Idaho, Arizona, and Washington, and maintains its principal place of business in Transylvania County, North Carolina, with a registered agent located at 160 Mine Lake Ct Ste 200, Raleigh NC, 27615. This Court has personal and specific jurisdiction over Defendant Trails as it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

66.     Defendant Trails Momentum (now, upon information and belief, rebranded as Momentum) A/K/A Trails Carolina conducts business nationwide, including in North Carolina, Oregon, Texas, Utah, Idaho, Arizona, and Washington, and upon information and belief maintains its principal place of business in North Carolina. This Court has personal and specific jurisdiction over Defendant Trails Momentum A/K/A Trails Carolina as it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

67.     Defendant Wilderness Training & Consulting a//k/a Family Help & Wellness conducts business nationwide, including in North Carolina, Oregon, Texas, Utah, Idaho, Arizona,

and Washington, and maintains its principal place of business at 530 Center St., NE, Suite 700, Salem, Oregon 97301 with a registered agent located at SW&W Registered Agents, Inc., 1211 SW Fifth Ave., Suite 1900, Portland, Oregon 97204. This Court has personal and specific jurisdiction over Defendant Trails as it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

68.     Defendant WTC Holdco, LLC conducts business nationwide, including in North Carolina, Oregon, Texas, Utah, Idaho, Arizona, and Washington, and maintains its principal place of business at 530 Center St., NE, Suite 700, Salem, Oregon 97301 with a registered agent located at SW&W Registered Agents, Inc., 1211 SW Fifth Ave., Suite 1900, Portland, Oregon 97204. This Court has personal and specific jurisdiction over Defendant WTC Holdco, LLC as it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

69.     Defendant WTCSL, LLC conducts business nationwide, including in North Carolina, Oregon, Texas, Utah, Idaho, Arizona, and Washington, and maintains its principal place of business at 530 Center St., NE, Suite 700, Salem, Oregon 97301 with a registered agent located at SW&W Registered Agents, Inc., 1211 SW Fifth Ave., Suite 1900, Portland, Oregon 97204. This Court has personal and specific jurisdiction over Defendant WTC Holdco, LLC as it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

70.     The Court has personal jurisdiction over Defendants as they conduct business nationwide, including in the state of North Carolina and their misconduct alleged herein took place nationwide, including in North Carolina.

71.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because one of the claims herein arises under federal law. The court maintains supplemental jurisdiction over the state claims in this case pursuant to 28 U.S.C. § 1367, as they arise from the same set of operative facts.

72.     Venue is proper in the Western District of North Carolina pursuant to 18 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged occurred within this judicial district. Venue is also proper under 18 U.S.C. § 1931(g) because Defendant Trails Academy, LLC's principal place of business is in Henderson County and Defendant Trails Carolina, LLC's principal place of business is in Transylvania County.

73.     While Plaintiff brings no medical malpractice claims or causes of action, and asserts that claims arise out of the Defendants' neglect, physical and sexual abuse, and forced labor and not medical mistakes, in an abundance of caution, the undersigned asserts, in compliance with Rule 9(j) of the North Carolina Rules of Civil Procedure prior to bringing the instant action, Plaintiff, through his lawyers, have retained an expert witness who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence. Prior to filing the instant complaint, said expert witness reviewed medical care and all medical records pertaining to the alleged negligence that are available after reasonable inquiry and is willing to testify that the Defendants' acts and omissions did not comply with the applicable standard of care. Unfortunately, due to hurricanes in North Carolina and Florida, not all records have yet been received.

74.     Additionally, this pleading alleges facts establishing negligence under the existing common-law doctrine of *res ipsa loquitur*, because it is within the common knowledge, experience and sense of laymen that Defendants should not have required John to suffer

11

deprivation and physical neglect while he was in their custody, and they should not have required John to suffer additional trauma related to sexual abuse and forced labor.

## FACTUAL BACKGROUND

### A. Defendants' Negligent and Unfair Business Practices Foster Abuse and Neglect on its Residents

75.     Defendants are in the business of profiting off the marketing of, referring to, and provision of wilderness and residential treatment programs to "troubled" teens and young adults.

76.     Defendants acknowledge children and young adults at Trails have behavioral difficulties such as self-image issues such as peer pressure, bullying, and low self-esteem; high risk of trauma; mental health disorders, such as depression, anxiety, and mood dysregulation; substance abuse; emotional management issues; and defiant behavior and claim to have expertise in providing services to such a population.

77.     The risks associated with this population are known to Defendants, and the staff hired to provide them services, are intentionally omitted from the marketing and advertising Defendants publish to the public or the intake materials and disclosures provided to parents, such as John's parents.

78.     Upon information and belief, Defendants conceal from the public incidents of physical abuse and neglect, food and clothing deprivation, injury, sexual abuse and battery, and forced labor to which its residents are subject, including Plaintiff and his family, for the purpose of lulling parents and residents into a misleading sense of security when entrusting their children to Trails' exclusive custody and care.

79.     Rather, Defendants attempt to mask events where residents in their care are injured, abused or mistreated, and fail to report events to the North Carolina Department of Health

and Human Services, Trails' licensing regulator, and other governmental authorities, even when faced with reasonable cause to suspect abuse or neglect has occurred in their programs.

80. Instead, Trails boasts "As a relationship-based program, we value creating a safe and nurturing community to help young adults grow."[6]

81. FHW, owner and parent of Trails, touts about their wilderness programs: "While the experience is overseen by professionals – that is to say, no real danger can come to the children – there is a degree of perceived risk and a sense of very real accomplishment."[7]

82. FHW further advertises itself as "a mental health and wellness program for young adults."

83. Defendants, including Trails, claimed to provide treatment for children and young adults who suffer with behavioral and mental health struggles. Its website is replete with statistics claiming the program is more than 90% effective at treating depression and other mental health diagnoses.

84. According to the Defendant FHW website, Defendants claim to have substantial experience and provide the utmost care and currently own 15 programs across five states in which they, "provide the highest-quality, personalized care."[8]

85. At all times relevant to this lawsuit, Trails' website from February 2021, just before Plaintiff's enrollment, shows Trails advertised:

---

[6] Trails Momentum Website, *FAQs,*
https://web.archive.org/web/20210301190615/https://trailsmomentum.com/faq/ (archived by Wayback Machine Jan. 24, 2021).
[7] Family Help & Wellness, *Wilderness Therapy*,
https://web.archive.org/web/20210109133909/https://famhelp.com/wilderness-therapy/ (archived by Wayback Machine on Jan. 9, 2021).
[8] Owners, Family Help & Wellness,
https://famhelp.com/owners/#:~:text=Family%20Help%20%26%20Wellness%20currently%20has,speaking%20engagements%20and%20board%20seats (last accessed Sep. 20, 2023).

"Our tranquil and beautiful location is the perfect backdrop for students to learn healthier ways to cope with anxiety, depression and other mental health and behavioral issues that are getting in the way of them accomplishing their goals."

86. Upon information and belief, Defendants, by and through its owners, officers, managers, employees and agents, have known for years that some of the residents, including Plaintiff do not learn healthier ways to cope with anxiety and depression, and instead further decompensate.

87. Upon information and belief, Defendants, by and through its owners, officers, managers, employees and agents, have known for years that some of the residents have been neglected, and sexually and physically battered by their staff and other residents at Trails, yet have failed to take corrective action.

88. Defendants knew or should have known the dangers that their staff and certain residents presented to others, including Plaintiff. However, Defendants ignored those dangers and allowed residents, including John, to be subjected to such misconduct despite having actual and constructive knowledge that these events occurred.

89. Upon information and belief, Defendants knew or should have known:

    a. Defendants were unable to provide, and did not provide, the services promised in their marketing materials to children and young adults, including Plaintiff;

    b. Defendants put residents, including the Plaintiff, in settings where staff and peers have the opportunity to neglect, physically and sexually abuse and force labor upon him and other residents given the secluded and unsupervised settings;

    c. Defendants subject its residents, including Plaintiff, to dangerous outdoors conditions, extremely inclement weather, malnutrition and settings that were life threatening;

    d. Defendants condition residents, including Plaintiff, to adhere to the

14

practice of strict obedience of its employees, and encourages an environment of "breaking down" its residents, creating an environment of fear and silence, which creates an environment that fails to protect them from neglect, abuse and forced labor;

e. Defendants promote the ideas of strict compliance, of not "rocking the boat," and of specifically shaming victims to not tell others what happened and blaming victims for events that occurred, all of which help facilitate a culture that keeps young victims, including Plaintiff, silent and compliant and fosters an environment for neglect, physical and sexual abuse and forced labor;

f. Defendants essentially trap children and young adults, including Plaintiff, in their programs, providing no way out, even for those like Plaintiff who were over 18.

90. Upon information and belief, Defendants knew or should have known that if they advised parents, including Plaintiff's parents', of past incidents of neglect, assault, battery, and sexual misconduct, and forced labor, parents would not trust them with their children and young adult's exclusive custody and care, costing Defendants the profit for which it operates.

91. Defendants fail to disclose to parents, including Plaintiff's parents, how little counseling children and young adults in their care receive with a licensed therapist, which is, upon information and belief, an hour or less per week. Instead, Defendants rely on field staff, who are only required to be 21 years old and possess a GED, to "carry out" "individualized" therapeutic treatment plans.

92. Plaintiff's parents relied on all the representations set forth herein when sending John to be in Defendants' custody and when purchasing Defendants' services.

## B. Defendants were Negligent and Reckless with John, Causing Significant Injury to him

93. Like many parents of children and young adults who suffer with mental health

and behavioral issues, John's parents were desperate to find John treatment and solutions for his struggles with debilitating depression and suicidal ideation.

94.     Defendants' program as advertised and marketed appealed to John's parents who, like other parents, were determined to find their child treatment and support.

95.     Plaintiff's parents spent countless hours researching various facilities and programs, including Defendants', before deciding where to send John.

96.     Plaintiff's parents were given the impression that the personnel they were speaking with from Defendants' program were licensed professionals.

97.     It turns out that Defendants' employee, Francis van de Beuken, Plaintiff's parents later learned was just a salesperson.

98.     Indeed, at all relevant times, Francis van de Beuken was the Executive Director of Marketing and Admissions for FHW from January, 2012 to September 2020. He was also the Director of Special Projects and Growth for Trails Momentum from April 2020 through February, 2023.

99.     Young adults like Plaintiff, were often sent to Defendants' under misleading pretenses and under the guise that the program provided adequate mental health treatment.

100.     Based on assurances from the Defendants, John's parents conveyed the information about the program to John and how they were assured that it would help him treat his depression.

101.     Defendants' employee, Francis van de Beuken misled Plaintiff's parents, and in reliance on his multiple misrepresentations, and those in the marketing materials described herein, they chose to purchase Defendants' services for their son, Plaintiff.

102.     Under the guise of going to receive mental health services with experienced staff, as well as the Defendants' representations that he would have opportunity to research, apply and enroll in college of his choice, John agreed to enroll in Defendants' program.

103.     Unbeknownst to John or his parents, Defendants and several other facilities are

16

within the "Troubled Teen Industry," a term coined by survivors of such facilities based upon the manipulative and misleading characterization of these children and young adults by Defendants and other programs in the industry. The term refers to entities that market themselves as an easy solution to fix family dynamics and "troubled teens," but have a dark history of abuse, negligence, and even death.[9]

104.    From the outset, there is an inherent power imbalance in the relationship between a resident and a residential program with temporary care and control for residents', including Plaintiff's, basic needs and well-being.

105.    Upon arrival at Trails, John was forcibly strip searched down to his underwear. A male staff member with no medical background, inspected John's body and used his hands to feel between John's legs and genitals. Taken aback and stunned by the invasive search, John's learned that there was a female staff also present in the room and as the exam was not conducted behind a screen or in a private area causing John to be mortified and his privacy rights violated. Had he been aware that staff would touch his genitals without his consent, it is likely John wouldn't have agreed to partake in this program.

106.    Trails states on their website: "We believe that you always have the option to leave if you choose. As an adult, you are capable of making that decision without your parent's support. We may offer guidance in your decision-making process and offer suggestions for alternative resources if you ask, but ultimately, it is up to you."[10]

107.    Soon after arriving, John learned the true nature of the Defendants' program. He quickly discovered he had no choice or option to leave the program, as he and his parents had previously been told. Instead, he would be forced back or even arrested if he attempted to leave.

---

[9] *See The Troubled Teen Industry*, Unsilenced, https://www.unsilenced.org/the-industry/, (last visited oct. 10, 2024) (Unsilenced is one of several organizations researching and advocating against the Troubled Teen Industry. More about the industry's history, tactics, and deadly abuse can be found on their website.)

[10] Trails Momentum Website, *FAQs,* https://web.archive.org/web/20210301190615/https://trailsmomentum.com/faq/ (archived by Wayback Machine Jan. 24, 2021).

108.     Further, he learned that despite being of the age of 18, the Defendants' made every decision about what he could eat, wear, do day-to-day, and even when he was allowed to talk to his parents, which was rare and far less than advertised.

109.     John was forced to spend his first two weeks at Trails alone, with only two staff members in an isolated cabin in the woods. He was told he had to quarantine to take precautions for COVID-19. He had no contact with peers during this time. Due to this, his mental health started to decline further.

110.     Once that initial period passed, John was only allowed to communicate with his parents through letters and a single phone call during the 93 days he was at Trails.

111.     Each letter John wrote was screened and monitored by staff before it was sent. If John wrote concerning information about his well-being or the program, his letter would be withheld.

112.     Trails purposefully limited options for John and others to report any concerns, abuses, or neglect by the program in order to retain business and keep receiving payments.

113.     During the single phone call John was allowed to have with his parents, John's therapist limited what could be discussed and the length of the call. If he attempted to raise concerns about his well-being or about abuses and neglect by the program, his therapist would mute the call to prevent that information from getting to his parents.

114.     John was surveilled by staff at Trails Momentum at all times. Staff watched him even during his most private activities as they sat outside when he used the bathroom or showered. Upon information and belief, these staff were not appropriately trained or qualified to supervise students like John but instead made students including John feel violated through this surveillance.

115.     During his time at Trails, John was forced to clean the central meeting hall, dorms, and bathrooms. He was also forced to cook meals and conduct landscaping on the grounds and gardens without compensation, therefore only Trails benefited physically and financially.

116.     According to Trails' website, they "Include the family throughout the process. For the duration of the Trails Momentum program, each family member is provided with the appropriate communication and clinical tools necessary to contribute to the process of become a healthy functioning family system." This was not true for John.[11]

117.     Plaintiff was then subjected to the Defendants' culture of manipulation, control, and gaslighting, as he was consistently given conflicting information about the program goals and leaving the program.

118.     During his enrollment, John was given limited access to hygiene supplies including shower or bath, clothes to keep him warm and dry after he was forced to hike through ice cold rivers and endure harsh frigid temperature in the wilderness.

119.     At times, John was forced to camp outdoors in 30-degree weather for several days at a time.

120.     During these trips his only source of heat was a fire he was forced to create himself if he wanted to try and keep warm.

121.     During his time in the wilderness, John and his cohort were forced to make their own fires by "bow-drilling," without matches or a lighter, using only pieces of wood and string.

122.     Defendants staff threatened John that if he was unable to make a fire, he be forced to eat his food dry and cold and freeze at night.

123.     Often his hiking boots would freeze after being forced to wade through freezing rivers.

124.     John had extreme difficulty creating fire, and therefore, there were times where the conditions were so cold that his hiking boots froze with his feet inside.

125.     If John was able, he would place his boots by the fire made by others to then

---

[11] Trails Momentum Website, *Programs For Struggling Young Adults,* https://web.archive.org/web/20210206125115/https://trailsmomentum.com/b/programs-struggling-young-adults/ (archived by Wayback Machine Jan. 24, 2021).

awake the following morning to frozen boots, as staff would put out everyone's fire each night causing them to refreeze.

126.    Defendants provided Plaintiff with only small increments of dried rice, beans, and lentils. during his time in the wilderness. He was not provided clean drinking water and was forced to drink from a creek, risking illness.[12]

127.    During many of these trips he realized how unsafe he was as he frequently encountered dangerous conditions such as a poisonous snake.

128.    Defendants forced John to carry an 80-pound backpack during these long hikes over the course of several days.

129.    During his stay, Defendants required John to hike between campsites for 3-4 days at a time, each week.

130.    Defendants did not allow Plaintiff access to a shower or bath during these hikes.

131.    Despite the Defendants' assurances their therapeutic program would help John overcome his depression, they did no such thing, and instead made his mental health worse.

132.    John was provided no appropriate mental health treatment at Trails. John was not evaluated to determine if he should continue taking the medication he had been prescribed before Trails or if he should go off of those medications or be prescribed different medications.

133.    While at Trails, John was not taking medication he had taken up to that point for depression. Defendants did not attempt to provide consultation of a medical professional regarding John's medication despite knowing that he had previously been prescribed medication for treatment of his mental health.

134.    John met with his assigned therapist once a week for an hour meaning that only

_____

[12] While Momentum provided a small filtration system attached to John's water bottle, the U.S. Centers for Disease Control does not recommend drinking water from a filtration system while in the wilderness as "most portable water filters do not remove bacteria or viruses. A filter…will remove parasites if used properly but will not remove viruses or all bacteria." Drinking Water, CDC, https://www.cdc.gov/drinking-water/prevention/water-treatment-hiking-camping-traveling.html?CDC_AAref_Val=https://www.cdc.gov/healthywater/drinking/travel/index.html (last accessed Sep. 20, 2024).

.5% of his time in Trails was engaging with a mental health staff person.

135. Instead, Trails had John spend most of his time with staff who were, upon information and belief, not trained or qualified to support him.

136. Defendants' staff often encouraged students to criticize each other and prevented them from complaining about their mental health, medical concerns, or other neglect they were experiencing.

137. Defendants' staff focused particularly on coercing young people in the program to blame themselves for health conditions and events outside of their control and to feel shame for their health and experiences. Staff would manipulate students into compliance by telling them they deserved the abuse, neglect, and mental health symptomology they experienced.

138. This caused John's mental health to rapidly deteriorate.

139. Instead of providing him treatment for his depression, as promised in their marketing and promotional materials, the Defendants' and their employees subjected John to severe neglect, inhumane conditions, forced him to perform unpaid labor, and abused him emotionally and sexually.

140. Defendants used force and threats to keep students within its programs. With an absolute disregard for John's right to choose to leave the program, Defendants' agents and employees threatened John that he would be forced back or even arrested if he attempted to leave.

141. Defendants utilized remote settings for their program, as this prevented students like John from attempting to leave on foot as it was a dangerous and lengthy hike through the wilderness.

142. Defendants' employees and agents routinely threatened and manipulated John and his peers by telling them the story of Alec Lansing.

143. Alec Lansing was a 17-year-old boy who attended Trails in 2014 and attempting to escape from the abusive program died in the wilderness. Alec was missing for almost two

weeks until rescuers discovered his body.[13]

144.    Defendants' employees and agents told John that if he attempted to leave, he would face the same danger and likely meet with the same fate.

145.    Defendants did not permit John to keep a cell phone or money so he would not have supplies to safely leave the program.

146.    Defendants further prevented John from escaping the abuse and neglect they experienced by restricting and censoring communication with family and the outside world.

147.    Defendants prevented John from communicating freely with his parents or others outside of his program by limiting when he could write letters or make phone or video calls.

148.    Defendants further restricted communication by surveilling the censoring the content of his written and verbal communication as well as the communications from his parents.

149.    John was only afforded one phone call with his parents in his entire 93 day stay in the program.

150.    When he tried to share complaints regarding the program and to ask to leave, Defendants' agent and employee cut him off by muting the call so that his complaints did not reach his parents or escape the confines of Defendants' program.

151.    Trails represented that they would help prepare John and other students for success in school, work, and young adulthood. They represented that they would assist in planning for higher education or a student's future after Trails.

152.     At the time John was enrolled in Trails, he was navigating the decision of where to go for his undergraduate education.

153.    Defendants put immense pressure on John to choose a university which had a Family Help & Wellness / Wilderness Training & Consulting affiliated transitional program in order to gain further business for Defendants.

---

[13] Holly Kays, *Atlanta Teen Missing From Wilderness Therapy Program*, Smoky Mountain News, Nov. 18, 2024, https://smokymountainnews.com/archives/item/14655-atlanta-teen-missing-from-wilderness-therapy-program.

154.     John wanted desperately to leave Trails and to discontinue any involvement with Defendants' abusive, coercive, and neglectful practices.

155.     Despite getting admitted to his dream school, under Defendants' pressure and coercion, John agreed to choose a university which had a transition program run by Defendants.

156.     If it were not for the pressure and manipulation by Defendants, he would not have chosen this university and has regretted this decision he was coerced to make.

157.     The Defendants' actions caused John immense emotional distress lasting to this day.

158.     John remained at Trails' facility for 93 days spanning from March to June of 2021, finally freeing himself of the trap with the assistance of his parents' insistence.

159.     John has suffered immense trauma and harm to his mental health resulting from his experience at Trails. He still suffers from vivid nightmares about being forced to remain at the program without any means of escaping.

160.     After John's stay at Trails Momentum, he returned home and began attending college. After his experiences with Trails, John developed a severe mistrust for mental health providers.

161.     As a result of the abuse and neglect John endured at Trails, five months later, John attempted suicide in his college dorm. He was transported to a nearby hospital and then admitted to an inpatient stay for psychiatric treatment.

162.     As a result of his suicide attempt and exacerbated mental health symptoms, John dropped out of college for a year

163.     He is now a year behind in seeking his education.

164.     Following the abuses and neglect he endured at Defendants' program, John's mental health deteriorated, and his mental health symptoms became overwhelming. This severely impacted his ability to function and manage his own affairs.

165.     John's mental health struggles worsened in time culminating in a mental health

crisis and suicide attempt in October 2021. John was hospitalized.

166.     John tried to continue going to school but, due to continuing mental breakdowns, John ended up needing to drop a number of classes because he was not able to manage his daily affairs on account of his mental health. John dropped out of school.

167.     During this time, John was so traumatized that he was unable to process or understand his experiences at Trails. At that time, John did not understand that the steep decline in his mental health was an injury resulting from Defendants' misconduct.

168.     As John was not able to manage his own affairs, his family arranged for him to take a year off of school and provided him with housing. John was prevented from filing his claims due to mental disability, "insanity," and "incompetence."

169.     It was not until recently that John was reasonably able to identify and understand and discover that what he experienced was abuse and neglect which caused him significant injury.

170.     Since John's experiences at Trails, he has suffered from panic attacks that impact his ability to live his life day-today, accompanied by physical symptoms such as rapid heartbeat and shortness of breath.

171.     John still suffers with nightmares, flashbacks, and intrusive thoughts about being trapped at Trails.

## CAUSES OF ACTION
### COUNT I
### Negligence/Gross Negligence
### (Against all Defendants)

172.     Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

173.     Defendants specifically marketed their services and experiences and invited residents with emotional issues to their therapeutic residential program, including John, who was an invitee.

174.     Defendants hold themselves out as a leader in wilderness therapy that helps children through its "approach to inspiring change in young adults draws on a sense of community

and adventure that helps shift the narrative about a young man or woman's trajectory."[14] They also claim all of their wilderness programs "share the same professionalism, respect, and experience that is required to take good care of a child on their journey away from home."[15] Because of this alleged expertise, John's parents entrusted John to Trails.

175.    Defendants held Trails out as an expert in working with children and young adults who had mental health disorders, behavioral concerns, developmental conditions, and social challenges.

176.    When Defendants took over the care and custody of its resident, including Plaintiff, Defendants assumed a duty of care towards Plaintiff.

177.    Defendants ordinarily have a duty to exercise reasonable prudence and foresight in operating their facility. However, the risk of danger in this situation is unusually high, as the Defendants were responsible for caring for young people with depression and other mental health issues.

178.    A failure to adequately care for these young people could easily lead to a risk of serious harm or death.

179.    Thus, the degree of care the Defendants were required to exercise is heightened.

180.    Defendants owed a duty to:

a. adequately warn of the risk of c use in its program prior to taking custody and large sums of money from the residents' parents, including Plaintiff;

b. adequately train and supervise those persons acting on its behalf how to guard against, identify, prevent and respond to sexual abuse and battery, as well as other forms of physical abuse and neglect;

c. to protect its residents from sexual abuse and battery, as well as other forms of

---

[14] Family Help & Wellness, *Trails Momentum*, http://web.archive.org/web/20210111143005/https://famhelp.com/trails-momentum/ (archived by Wayback Machine on Jan. 22, 2021)

[15] Family Help & Wellness, *Wilderness Therapy*, https://web.archive.org/web/20210109133909/https://famhelp.com/wilderness-therapy/ (archived by Wayback Machine on Jan. 9, 2021)

medical, nutritional and physical deprivation and neglect;

d. to adequately investigate abuse and neglect of its residents;

e. protect is residents, including Plaintiff, from dangerous, inhumane conditions;

f. provide appropriate services as to residents, including Plaintiff; and

g. perform the services as advertised and marketed to Plaintiff and Plaintiff's parents.

181. Defendants owed a duty to provide a safe environment for the children and young adults in their custody for a number of reasons in addition to its duties *in loco parentis*, and assumption of duty doctrine, including without limitations, the following:

a. Defendants undertook and administered psychological therapy, youth-development programs, activities, and services to residents, and as a result assumed a duty to Plaintiff and other children and young adults to exercise reasonable care in connection with its activities and services;

b. N.C.G.S. §7B-301 places an affirmative duty upon Defendants, and its employees and agents to report sexual abuse, and N.C.G.S. §7B-310 removes any privilege that Trail Carolina's counselors could otherwise use to shield the failure to report;

c. Defendants had special relationships with the children and young adults who were entrusted to their care and control, including Plaintiff;

d. Defendants were an organization obligated to take reasonable steps to respond to and prevent sexual abuse of the children and young adults who participate in its programs; and

e. Defendants invited Plaintiff and other children and young adults onto property under its ownership or control, and had an obligation to keep them safe from danger.

182. Defendants breached their duties to Plaintiff by, including, but not limited to:

a. failing to adopt policies and procedures that required its employees and clinical staff to perform a proper assessments of children and young adults admitted to Trails that identifies disorders and other factors and developing an individualized plan of care for residents of Trails;

b. failing to assure Plaintiffs was placed into a group setting with children and young adults who had similar mental health issues. Upon information and belief, residents in Plaintiff's cohort were at Trails for trauma related to sexual and physical abuse, and substance abuse;

c. failing to monitor the premises where it held custody over many residents with pre-existing issues and tendencies, to ensure that they did not do foreseeable harm Plaintiff, who was also an invitee under North Carolina law;

d. failing to hire and provide sufficiently trained staff and failing to train staff to handle the issues for which it marketed and claimed to provide to residents, including Plaintiff;

e. failing to develop any centralized format to ensure that health and safety self-inspections were being performed by Trails;

f. failing to systematically review the appropriateness of services and patterns of service utilization at Trails or adopt policies and procedures that required this to be done;

g. failing to provide adequate security and safety for residents, including Plaintiff, in their custody;

h. failing to follow statutory mandates and their own policies and procedures relating to investigating misconduct perpetrated on tis residents, including Plaintiff;

i. failing to adequately proper clothing, boots and gear and living conditions to keep them safe from harm;

j. failing to provide adequate food, access to hygiene and medical care to its residents, including Plaintiff;

k. failing to act as a reasonable persons would to protect Plaintiff and failing to take even the slightest degree of care and were grossly negligent in their disregard for the well being of Plaintiff, who was entrusted to their care; and

l. in such other ways as will be revealed in the course of discovery in this case.

183. It was foreseeable to Defendants that their inadequate policies and procedures, their lack of appropriate supervision and training of employees, their failure to accurately assess their employee's skills or the effectiveness of the services provided to children and young adults, including Plaintiff, and their failure to systemically address ethics, legal requirements, boundaries, trauma, and compliance would result in their residents, including as Plaintiff, suffering inexcusable physical harm, neglect and forced labor.

184. Defendants' actions and inactions were the proximate cause of Plaintiff's injuries,

causing him to suffer grievous bodily injury, dissociative symptoms, panic attacks triggered by stimuli that reminds him of his experience at Defendants' program, self-hatred and loathing, emotional pain and suffering.

185.    As a direct and proximate result of the Defendants' negligent acts, Plaintiff has been catastrophically injured and sustained permanent and severe emotional distress.

186.    As a result of the Plaintiff's injuries caused by the Defendants, Plaintiff has been admitted to a psychiatric hospital for suicidal ideation, forced to drop out of college for a year to address his mental health, and is now a year behind his peers in college. John continues to be haunted by the abuse he faced at the hand of the Defendants.

187.    As the direct result of the foregoing negligent infliction of emotional distress, and the immoral, unethical and unscrupulous manner that Defendants conduct its business, Plaintiff was substantially injured, and they hereby seek relief in excess of $75,000.00, exclusive of interest and costs.

### COUNT II
### Negligent Infliction of Emotional Distress
### (Against all Defendants)

188.    Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

189.    Defendants negligently engaged in conduct causing distress to Plaintiff.

190.    It that was reasonably foreseeable to Defendants that this conduct would cause severe emotional distress.

191.    Defendants misconduct did in fact cause the Plaintiff severe emotional distress.

192.    Indeed, Plaintiff suffered depression, anxiety, suicidal ideations, and other mental health diagnoses of severe and disabling emotional disorders qualify as severe emotional distress as a matter of North Carolina law as a result of Defendants misconduct.

193.    The Defendants in this case clearly acted negligently, as stated throughout this complaint.

194.    It is foreseeable to any reasonable person that subjecting someone to

extremely harsh living conditions, emotionally and sexually abusing them, and forcing

them to perform labor for no pay would lead to severe emotional distress. In fact, no reasonable

person would expect anything else to result from these actions besides irreparable, egregious

harm.

195.    To this day, John experiences pain, suffering, and mental anguish as a result of the

Defendants' abuse. This distress has already led to a delay in John's college career, and it is likely

to lead to future lost wages and a loss of earning capacity as his mental health and trauma

symptoms interfere with his day-to-day life.

196.    As the direct result of the foregoing negligent infliction of emotional distress, and

the immoral, unethical and unscrupulous manner that Defendants conduct its business, Plaintiff

was substantially injured, and they hereby seek relief in excess of $75,000.00, exclusive of interest

and costs.

### COUNT III
### Violations of 18 USCS § 1589 (Labor Trafficking)
### (Against all Defendants)

197.    Plaintiff realleges and incorporates every allegation of this Complaint as if each

were set forth fully and completely herein.

198.    18 USCS § 1589 prohibits knowingly obtaining labor through force, threats of

force, or coercion. More specifically, Section 1589(a)(4) prohibits obtaining labor services

through "any scheme, plan, or pattern intended to cause the person to believe that, if that person

did not perform such labor or services, that person would suffer serious harm."

199.    Section 1589(c) makes it unlawful to financially benefit from the actions described

in subsection (a).

200.    Defendants forced Plaintiff to clean their facilities including their dorms and

bathrooms for no pay.

201.    Plaintiff was also forced to cook meals and attend to the grounds and garden by

the Defendants.

202.    Defendants also forced John to carry an 80-pound backpack long distances in sometimes brutal weather conditions to transport the gear necessary to run Trails' operations from site to site.

203.    Following a long day of hiking with a heavy pack through frigid rivers, Plaintiff was then forced by Defendants to perform the labor of starting a fire using only his physical strength and nearby wood if he wanted to be able to eat dinner.

204.    Defendants coerced John into completing this labor under a threat of disciplinary action, the withholding of basic needs such as food, and an extension of his stay.

205.    Defendants' businesses are profitable, in part, because it uses and exploits the free labor of those enrolled in its program.

206.    In doing so, the Defendants save on expenses such as hiring cleaning staff, paying to transport gear between campsites, and paying for fire-starting gear.

207.    The Defendants required John provide these services without pay or risk disciplinary action and a longer stay at the facility.

208.    Defendants financially benefited from Plaintiff and other residents free labor, as they did jobs that Defendants would have otherwise have to pay staff to perform.

209.    As the direct result of the foregoing violation of 18 USCS § 1589 and the immoral, unethical and unscrupulous manner that Defendants conduct its business, Plaintiff was substantially injured, and they hereby seek relief in excess of $75,000.00, exclusive of interest and costs.

<u>COUNT IV</u>
**Violations of NC UDTPA, N.C.G.S. § 75-1.1 *et seq*.**
**(Against Defendant Trails)**

210.    Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

211.    Trails engaged in numerous unfair acts that were immoral, unethical, oppressive,

unscrupulous, and substantially injurious to Plaintiff, and other consumers.

212.     Trails has a knowledge advantage that consumers do not about its business, both prior to parents choosing to trust their children and young adults, including Plaintiff, to its custody and care, and while Trails has exclusive custody and care over its residents. Trails' unfair acts include, without limitation, the following:

a. By mischaracterizing and intentionally withholding the risk profile of children and young adults it admits into its program and the risk of sexual misconduct being committed upon its residents, including Plaintiff;

b. Defendants fail to disclose that accepts residents who have been physical and/or sexually abused or have committed sexual abuse themselves, or had substance abuse issues, and that some of those residents later become staff;

c. by characterizing its staff as experienced and expertly trained with decades of experience, when for the most part, children and young adults interact with young field staff who are only required to have GED, are not trained or licensed to provide any mental health service, and who are not adequately trained or supervised by Defendants.

d. by withholding from parents and residents, including Plaintiff, the true risks of abuse in its program;

e. by withholding from parents and residents, including Plaintiff, timely information about children and young adults suffering assault and battery while in Trails' custody and care;

f. by publishing misleading statistics on its website that overstates the positive outcomes for students enrolled in its program;

g. by calling enrollees "students" when Plaintiff and other residents had very little schooling and received no academic credit for their time at Trails;

h. by failing to make to criminal reports in order to avoid public scrutiny into its business operations;

i. by failing to take the necessary steps in its business operations to prevent and promptly intervene in incidents of sexual assault and battery, including choosing to admit and retain staff and students with a history of sexual misconduct and failing to provide adequate training and supervision of its employees; and

j. and in such other ways as will be revealed in the course of discovery in this case.

213.    As the direct result of the foregoing unfair business practices and the immoral, unethical and unscrupulous manner that Defendants conduct its business, Plaintiff was substantially injured, and they hereby seek relief in excess of $75,000.00, exclusive of interest and costs.

**<u>COUNT V</u>**
**Violation of Oregon Unlawful Trade Practices Act, Or. Rev. Stat. 646.608, *et seq.***
**(Against Defendants FHW and WTC)**

214.    Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

215.    Defendants acted willfully, and as a result of their misrepresentations and failures to disclose, plaintiffs and members of the class suffered ascertainable loss of money.

216.    Plaintiffs and members of the class are entitled to refunds, together with interest. ORS 646.636.

217.    As the direct result of the foregoing unfair business practices and the immoral, unethical and unscrupulous manner that Defendants conduct its business, Plaintiff was substantially injured, and he hereby seeks relief in excess of $75,000.00, exclusive of interest and costs.

**PRAYER FOR RELIEF**

WHEREFORE: Plaintiff John Done requests judgment against Defendants individually and jointly, for damages for all injuries and losses recoverable, including but not limited to:

A) Award John Doe all available damages, including, but not limited to Compensatory and Punitive Damages;

B) Award John Doe reasonable attorneys' fees pursuant to 18 U.S.C. § 1595;

C) Award John Doe costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure

D) Award John Doe pre- and post-judgment interest in an amount according to the

proof at trial; and

E) Grant John Doe any further relief the Court may deem just and proper.

### **N.C. Rule of Civil Procedure 9(j)**

Plaintiff asserts that Federal Rules of Civil Procedure preempt Rule 9(j) of the North Carolina Rules of Civil Procedure, and therefore Rule 9(j) is not applicable in this case. If it is applicable, Plaintiff asserts that Rule 9(j) is unconstitutional as applied here. Under the circumstances of this case, application of Rule 9(j) is not appropriate because the misconduct giving rise to this action is not medical malpractice. Moreover, application of Rule 9(j) would effectively require plaintiff to prove her case before factual discovery is even begun, violate his rights of due process of law and equal protection under the law, violate his right to open courts, violate his right to a jury trial, violate the separation of powers, and confer an exclusive emolument on health care providers, in violation of the United States and North Carolina constitutions.

Under the circumstances of this case, application of Rule 9(j) would violate plaintiff's rights under the Seventh and Fourteenth Amendments of the United States Constitution, and Article I, sections 6, 18, 19, 25 and 32 and Article IV, sections 1 and 13 of the North Carolina Constitution. Accordingly, plaintiff objects to the application of Rule 9(j) in this case. Without waiving his objection, counsel for plaintiff provides the following information to comply with the requirements of Rule 9(j): the care rendered by defendants and all medical records pertaining to the alleged negligence that are available to plaintiff after reasonable inquiry have been reviewed before the filing of this complaint by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the care provided by defendants did not comply with the applicable standard of care.

Because of the exigent circumstances related to the hurricane, record departments in North Carolina and/or Florida have not produced all requested records to plaintiff, and therefore

we also have requested a Rule 9(j) extension of time. If the Court later determines that plaintiff's 9(j) expert does not meet the requirements of Rule 702(b) or Rule 702(c), plaintiff will seek to have that person qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence, and plaintiff hereby moves the Court, pursuant to Rule 9(j)(2), to so qualify that person.

WHEREFORE, Plaintiff demands:

a. That Plaintiff have and recover of Defendants, jointly and severally, a sum in excess of $75,000 in compensatory damages, plus interest from the date the suit was instituted, as provided by law;

b. To the extent necessary, Plaintiff hereby moves to have the 9(j) experts qualified under Rule 702(e) of the North Carolina Rules of Evidence;

c. That the costs of this action be taxed against Defendants, including attorneys' fees; and

d. For such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial regarding all triable claims.


Dated: October 11, 2024

**RESPECTFULLY SUBMITTED,**

/s/ *Joel R. Rhine*

RHINE LAW FIRM, P.C.
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
John Bruno, NCSB 54775
Email: jab@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403

34

Tel: (910) 772-9960
Fax: (910) 772-9062

*/s/ Kimberely Dougherty*

Kimberly A. Dougherty, Esq.
*(pending pro hac vice admission)*
Martha Carol, Esq.
*(pending pro hac vice admission)*
JUSTICE LAW COLLABORATIVE
210 Washington St.
North Easton, MA 0256
(508) 230-2700
kim@justicelc.com
martha@justicelc.com