# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

## CIVIL ACTION NO.: 1:24-cv-00253-MOR-SCR

| | |
|---|---|
| **JOHN DOE M.D.Y.,**<br><br>    Plaintiff,<br><br>vs.<br><br>**TRAILS ACADEMY, LLC., TRAILS CAROLINA, LLC., TRAILS MOMENTUM A/K/A TRAILS CAROLINA, WILDERNESS TRAINING & CONSULTING, LLC D/B/A FAMILY HELP & WELLNESS, WTC HOLDCO, LLC, WTCSL, LLC and UNNAMED ENTITIES 1-10,**<br><br>    Defendants. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' 12(B)(1) MOTION TO DISMISS OR OTHERWISE COMPEL ARBITRATION** |

Plaintiff John Doe M.D.Y. ("John") hereby opposes Defendants' motion to dismiss his complaint or alternatively to compel arbitration. For the reasons set forth herein, Plaintiff respectfully requests that the Court deny Defendants' motion.

## INTRODUCTION

This case arises from an unlicensed teen and young adult wellness program subjecting a vulnerable and struggling 18-year-old to sexual assault and three months of emotional abuse, neglect, and forced labor, for which it charged him and his family over $60,000. The various owners and corporate entities tied to the program now seek to shield themselves behind an unconscionable and narrow arbitration agreement procured through duress, misrepresentation, and a breach of their fiduciary duty. Their attempt to evade this Court is not only meritless as it relates to most of the non-signatory Defendants, but it is also premature, and inappropriate given none of

the Defendants performed under the terms of the agreement. The Court should deny their request and allow Plaintiff discovery into the true nature of their corporate relationships, the invalidating circumstances under which they obtained the arbitration agreement, and the voidability of the agreement for Defendants' lack of performance.

## FACTUAL BACKGROUND

### The Corporate Shell Game and Troubled Teen Industry

The Defendants are a web of related entities. Wilderness Training & Consulting, LLC (WTC) is part of a collection of affiliated for-profit businesses that provide wilderness and residential treatment programs to troubled teens and young adults that are struggling with mental health issues. (ECF No. 3, herein "Compl.", at ¶¶ 75,76 ). WTC operates under the Family Help & Wellness (FHW) name. (Compl. ¶ 19). FHW/WTC is the managing member of Trails Academy, LLC and Trails Carolina, LLC. *Id.* Trails Momentum is now called Momentum but is otherwise known as Trials Carolina. (Compl. ¶ 18). Trails Momentum/Momentum/Trails Carolina is run by Trails Academy, LLC; Trails Carolina, LLC; and WTC/FHW. *Id.* The defendant entities have made inconsistent statements as to WTC's managing members. (Compl. ¶¶ 19, 21). WTC's managing member is either WTC Holdco, LLC or WTCSK, LLC, or it is some combination of the two, or neither. (Compl. ¶¶ 19-21). WTCSL, LLC's membership consists of dozens of separate entities and individuals. (Compl. ¶¶ 22-55). The ownership list includes the following: multiple holdings LLCs, several consulting groups, at least one private equity firm, and no less than 20 separate individuals from around the country. (Compl. ¶¶ 22-55).

FHW advertises itself as "a mental health and wellness program for young adults." (Compl. ¶ 82). The Defendants specifically claim to offer effective treatment for treating young adults with depression, like Plaintiff. (Comp. ¶ 83). The Defendants represented to Plaintiff and his parents that no real danger could come to young adults who seek treatment at their facilities. (Compl ¶ 81). The Defendants claimed to have "substantial experience" in treating mental health

2

issues and that they provided the "highest-quality, personalized care," including to the Plaintiff. (Compl. ¶ 84). Plaintiff's parents were desperate to find him treatment and solutions for his struggles with debilitating depression and suicidal ideation. (Compl. ¶¶ 93--95). Defendants' representatives and website statements assured Plaintiff and his parents that their facility would help him with is mental health struggles. (Compl. ¶ 96-100)

Defendants represented to Plaintiff's parents that the representatives they were speaking with were licensed professionals. (Compl. ¶ 96). Plaintiff's parents specifically spoke with Francis van Beuken throughout the admissions process and during their information gathering. (Compl. ¶ 97). Plaintiff's parents recommended to John that he enroll at Trials based on their research and Defendants' representations. (Compl. ¶ 100). Plaintiff also received reassurances from Francis van Beuken, and agreed to enroll because he thought Defendants would help him with his mental health issues, and because his treating therapist threatened to section him in a mental hospital. (Compl. ¶ 102). Plaintiff was only 18 when he enrolled at Trails and because of his mental health condition, he was incapacitated and under duress. (Compl. ¶ 108).

Trails, and several of Defendants' other locations and entities, are within the "Troubled Teen Industry," ("TTI") which is a term coined by survivors of these facilities. (Compl. ¶ 103). TTI is a dark industry that has a reputation among survivors of manipulating kids and young adults into attending and then staying at the program, despite the abuse they suffer once there. (*Id.*) Defendants never told any of this to Plaintiff or his parents. (Compl. ¶¶ 78, 79). Rather, Defendants, like other TTI facilities, withheld this information to solicit trust and manipulate Plaintiff and his parents. (Compl. ¶ 90).

TTI facilities, including Defendants, hold an inherently significant power imbalance in the relationship with residents. (Compl. ¶ 104). Defendants told Plaintiff and his parents that he could leave Trails whenever he wanted. (Compl. ¶ 106). Plaintiff and his parents relied on this assurance when choosing Trails. (Compl. ¶¶ 100-102). In fact, Defendants did not allow Plaintiff to leave, or to even have unsupervised communication with his parents. (Compl. ¶¶ 107, 110-

14).

Plaintiff filed the active complaint on October 11, 2024. (ECF No. 3). Defendants filed their Motion to Dismiss or Otherwise Compel Arbitration on December 30, 2024. (ECF 32). The Court stayed the matter pending mediation, which occurred on April 3, 2025. A resolution was not reached, it was evident that Defendants' did not mediate in good faith.

## LEGAL STANDARD

"[T]he existence [of] a written agreement to arbitrate is a merits question that does not affect subject-matter jurisdiction." *Reddy v. Buttar*, 38 F.4th 393, 399 (4th Cir. 2022) (quoting, *Al-Qarqani v. Chevron Corp.* 8F.4th 1018, 1024 (9th Cir. 2021) Rather, "[i]n 28 U.S.C. §§ 1331 and 1332(a), Congress granted federal courts jurisdiction over two general types of cases: cases that arise under federal law, §1331, and cases in which the amount in controversy exceeds $75,000 and there is diversity of citizenship among the parties, §1332(a). *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 437-38 (2019)(internal quotations omitted). Thus,  "when federal law creates a private right of action and furnishes the substantive rules of decision, the claim arises under federal law, and district courts possess federal-question jurisdiction under § 1331." *Mims v. Arrow Fin. Servs., LLC* 565 U.S. 368, 378-79 (2012). A TVPRA claim is a federal question claim. *See Elat v. Emandopngoubene*, 2013 U.S. Dist. LEXIS 37875, * 2 (D. Md. 2013).

"Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986). Therefore, to compel arbitration under 9 U.S.C. § 4, the movant must show that all four of the following elements are met:  "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [non-movant] to arbitrate the dispute." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002) (citation omitted). "[A] defendant who seeks to compel arbitration under the Federal

Arbitration Act bears the burden of establishing the existence of a binding contract to arbitrate the dispute." *See, e.g., Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assur. Co.*, 867 F.3d 449, 456 (4th Cir. 2017).

As to a disputed arbitration agreement, "[i]t is [also] well established that when a challenge to the existence of a contractual obligation is properly raised, '*the court* determines whether a valid arbitration agreement exists' '*before* referring a dispute to an arbitrator.'" *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 286 (2023) (emphasis in original) (quoting, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). "Because the issue of whether an arbitration agreement has been formed is an issue of contract law, we apply the "ordinary state-law principles that govern the formation of contracts" in reviewing a challenge under § 4." *Berkeley Cty. Sch. Dist. v. Hub Int'l. Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019).

Courts may resolve these factual disputes, like those present here, by "affording targeted discovery…as necessary and appropriate to resolve the motion." *Naimoli v. Pro-Football, Inc.*, 120 F.4th 380, 380 (4th Cir. 2024). Consistent with this approach, "if a party challenges the enforceability of an arbitration agreement, courts generally permit discovery regarding the formation and performance of the arbitration provision." *Ross v. Fin. Recovery Servs.*, 2022 U.S. Dist. LEXIS 20829, at *4 (W.D.N.C. Feb. 4, 2022) (quoting *Dillon v. BMO Harris Bank, N.A.*, 2015 U.S. Dist. LEXIS 147372, 2015 WL 6619972, at *3 (M.D.N.C. Oct. 30, 2015)); *see also Scales v. SSC Winston-Salem Operating Co., LLC*, 2017 U.S. Dist. LEXIS 165234, 2017 WL 4467278, at *6 (M.D.N.C. Oct. 5, 2017) (finding defendant's request to compel arbitration premature and ordering discovery).

## ARGUMENT

### I.    The Court Has Subject Matter Jurisdiction and Dismissal is Improper

Defendants have filed a motion to dismiss under Rule 12(b)(1) and, presumably in the alternative, a motion to compel arbitration. This presents an inherent contradiction: it is axiomatic

that the Court could not compel arbitration if it lacked subject matter jurisdiction. Regardless, this Court has proper subject matter jurisdiction, and dismissal is inappropriate.

Defendants cite no authority for their position that the arbitration agreement, alone, divests this Court of subject matter jurisdiction. While circuits are split on the proper procedural vehicle for arbitration motions, neither the Supreme Court nor the Fourth Circuit has definitively endorsed Rule 12(b)(1) as the appropriate mechanism.

The Supreme Court's reasoning in *Atlantic Marine* is instructive. There, the Court held that federal venue laws, not forum selection clauses, govern venue under Rule 12(b)(3). *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 55 (2013) ("Whether venue is wrong or improper depends exclusively on whether the court in which the case was brought satisfied the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause."). By the same logic, "an arbitration agreement has no relevance to the question of whether a given case satisfies constitutional or statutory definitions of jurisdiction." *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 880-81 (8th Cir. 2018) (*internal quotations omitted*).

Subject matter jurisdiction in this case is clearly satisfied. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants and the amount in controversy exceeds $75,000 (Compl. ¶ 62). The Court also has jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings a federal cause of action pursuant to 18 U.S.C. § 1589 (Compl. ¶¶ 197-209); *see also Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009) (holding that courts can "look through" a motion to compel arbitration to determine whether the underlying dispute provides an independent basis for subject matter jurisdiction).

Even if the Court were to find that all claims are subject to arbitration, dismissal would remain improper. The Supreme Court recently clarified that "when a federal court finds that a

dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration." *Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024). Plaintiff hereby requests that the Court stay these proceedings if it finds that some or all claims are subject to arbitration, but before making any such decision or ordering a stay, Plaintiff is entitled to discovery on the validity and enforceability of the contract as to all Defendants and all counts.

## II.    Defendants Motion Should Be Denied or Discovery Should be Allowed

Plaintiff presents several arguments that turn on material factual disputes that cannot be resolved on the current record. First, Defendants have not established that any of the non-signatory Defendants can enforce an agreement signed only by Plaintiff and Trails Academy, LLC. Second, the factual circumstances surrounding the formation and presentation of the Agreement— including potential duress, misrepresentation, impossibility, incapacity, and unconscionability— are at issue. Third, the Defendants failed to perform under the contract, making it void. Finally, the Court cannot determine whether Defendants breached their fiduciary duty to Plaintiff without further factual development. The resolution of any of these disputed facts would significantly affect the validity and enforceability of the purported arbitration agreement and, consequently, the disposition of Defendants' Motion. Discovery is needed into each of these issues.

### A.  Non-Signatories Cannot Compel Arbitration

"[A] court, not an arbitrator, must determine whether a non-signatory to an agreement that contains an arbitration provision can enforce that provision against a signatory to the agreement." *Isernia v. Danville Reg.'l Med. Ctr.*, 2024 U.S. App. LEXIS 11806, at *2 (4th Cir. 2024)(citing, *Rogers v. Tug Hill Operating, LLC*, 76 F. 4th 237 (4th Cir. 2023). A non-signatory may only invoke and enforce an arbitration agreement "if the relevant state contract law allows him to

enforce the agreement." *Rogers*, 76 F.4th at 287 (quoting, *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 632 (2009). The parties agree that North Carolina law applies to this dispute. (ECF No. 32, herein, "Def. Mot." at 2).

"Generally, one who is not a party to an arbitration agreement lacks standing to compel arbitration." *Adams v. Pulliam*, 2006 N.C. App. LEXIS 839 (2006). North Carolina courts have allowed non-signatory defendants to compel arbitration, but only when "the existence of a legally recognized relationship between the non-signatory and the signatory was not in dispute." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 360 (2019) (citing, *Brown v. Centex Homes*, 171 N.C. App. 741-745-46 (2005); *Ellison v. Alexander*, 207 N.C. App. 401, 411-12 (2010)). This has generally required a showing of agency, because only "an agent can assume the protection of the contract which the principal has signed." *Brown v. Centex Homes*, 171 N.C. App. 741, 745 (2005). Ultimately, "the party seeking to compel arbitration bears the burden of proving an agreement binding that party." *Hager*, 264 N.C. App. at 360 (citing, *Sciolino v. TD Waterhouse Investor Services, Inc.*, 149 N.C. App. 642, 645 (2002) (finding that allegations in the complaint alone were insufficient to satisfy the non-signatory defendants' burden). Defendants have not met their burden.

By Defendants' own admission, "Trails Academy is the only named defendant that is a party to the Agreement..." (Def. Motion at 6). To circumvent this fundamental problem, Defendants vaguely assert that "all of the named Defendants are intricately related" (*Id*. at 7) without defining what "intricately related" means or providing any factual support for this characterization.

This vague assertion of relatedness is not only legally insufficient but also tactically self-serving. Defendants note their relatedness "simply for purposes of judicial economy" while

simultaneously "expressly reserv[ing] all defenses available to each entity." (*Id.* at 3, fn. 2). This is a transparent attempt to have it both ways: claiming the entities are inseparable for purposes of enforcing arbitration but reserving the right to assert their separateness, presumably, when facing liability later. A generic and contradicted statement of "relatedness" falls far short of the rigorous legal standard required for non-signatories to enforce an arbitration agreement.

On its face, Defendants' bare Motion does not satisfy their burden. It and arbitration should be denied on this ground alone as to every Defendant, with the exception of the signatory, although it should be denied against the signatory on other grounds set forth herein. Should the Court be inclined to entertain Defendants' assertions that the non-signatories of such a complex web of entities are somehow bound to the Agreement, the Plaintiff respectfully requests the opportunity to conduct discovery into the relationship between Trails and the non-signatory Defendants.

**B. Plaintiff Has Valid Defenses that Invalidate the Contract**

Section 2 of the FAA provides that a written agreement "shall be valid, irrevocable, and enforceable, **save upon such grounds as exist at law or in equity for the revocation of any contract**." *American General Life and Accident Ins. Co. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005)(citing 9 U.S.C. §2)(*emphasis added*). Therefore, "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability may be applied to invalidate arbitration agreements without contravening §2." *American General Life*, 429 F.3d at 87 (citing, *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Ultimately, "[t]he federal policy is about treating arbitration contracts like all others, *not about fostering arbitration*." *Morgan*, 596 U.S. at 418 (emphasis added).

**1. Defendants Obtained the Arbitration Agreement Through Duress**

"Duress exists where one, by the unlawful act of another, is induced to make a

contract…under circumstances which deprive him of the exercise of free will. *Radford v. Keith*, 160 N.C. App. 41, 43-44 (2003). The absence of free will may be determined by the following: (1) age and mental condition of the victim; (2) whether the transaction was fair; (3) relationship of the victim to the alleged perpetrator; (4) whether the perpetrator actively sought the transfer [contract]; and (5) whether the victim was in distress or an emergency situation. *Stegall v. Stegall*, 100 N.C. App. 398, 401-02 (1990). "Whether duress exists 'depends upon the totality of the circumstances." *Coley v. Cowan*, 2019 N.C. App. LEXIS 439, *10 (2019)(quoting, *Link v. Link*, 278 N.C. 181, 195 (1971).

Each of the elements is readily met here. First, and as discussed herein, Plaintiff was merely 18, and in an acute mental health crisis, when he signed the arbitration agreement. (Compl. ¶¶ 93-95, 108, 166). This combination of youth and psychological stress severely compromised his capacity to exercise autonomous judgment. Second, as demonstrated herein, the arbitration agreement contains substantively unconscionable provisions limiting Plaintiff's access to evidence and statutory remedies, rendering the transaction fundamentally unfair. Third, Defendants are a conglomerate of sophisticated entities backed by countless individuals, hedge funds, and holdings LLCs, that purports to provide mental healthcare, while Plaintiff was 18 and in an acute mental health crisis. (Compl. ¶¶ 17-56, 93-95, 108, 166). Finally, Defendants solicited and occupied a position of trust with Plaintiff by virtue of their self-presentation as "experienced" mental healthcare providers. (Compl. ¶¶ 5, 8, 102). This created a fiduciary relationship that Defendants exploited through misrepresentations about their services.

Finally, Defendants actively pursued Plaintiff as a client through their representative Francis van de Beuken who allowed Plaintiff's parents to assume he was a mental health professional rather than the marketing and sales agent he actually was. (Compl. ¶¶ 93-99). These

material misrepresentations about both Francis van de Beuken's qualifications and Defendants' services directly induced Plaintiff and his parents into signing the Agreement. Finally, Plaintiff's acute mental health crisis constituted an emergency situation and Plaintiff and his parents were desperate to get him help and left with no choice but to sign the Enrollment Agreement containing the arbitration agreement. (*see* Exhibit A, at pg. 1, "…if we do not receive the following documents [Enrollment Agreement containing arbitration agreement] that the student [John] will not be able to enroll at Trails Momentum **until the documents are received**.")(*emphasis added*).

Given these circumstances, Plaintiff had no meaningful choice but to acquiesce to Defendants' terms, rendering his signature the product of duress rather than voluntary assent. At minimum, these threshold facts warrant discovery into the circumstances surrounding the Agreement's execution before Plaintiff can be compelled to arbitrate his claims.

### 2. The Agreement is Unconscionable

"[E]quity may require invalidation of an arbitration agreement that is unconscionable." *King v. Bryant*, 369 N.C. 451, 459 (2017)(quoting, *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 101-02 (2008). "A party asserting that a contract is unconscionable must prove both procedural and substantive unconscionability." *Tillman*, 362 N.C. at 370. "Substantive unconscionability…refers to harsh, one-sided, and oppressive contract terms." *Heidbreder v. Epic Games*, 438 F.Supp. 3d 591, 597 (N.C.E.D. 2020) (quoting, *Tillman*, 362 N.C. at 370. "[P]rocedural unconscionability involves "bargaining naughtiness" in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power." *Tillman v. Commercial Credit Loans,* 362 N.C. 93, 102, 655 S.E.2d 362, 370 (2008*) (plurality opinion) (citing *Rite Color Chem. Co. v. Velvet Textile Co.,* 105 N.C. App. 14, 20, 411 S.E.2d 645, 648 (1992)).

As to procedural unconscionability, all three elements are at play in this matter: unfair surprise, lack of meaningful choice, and inequality of bargaining power. *See Tillman*, 362 N.C. at 102-03, 655 S.E.2d at 370. Threshold evidence already exists to warrant discovery on each element. Plaintiff was experiencing an acute mental health crisis when he signed the agreement, rendering him particularly vulnerable to coercion. (Compl. ¶¶ 93-95, 108, 166). The Enrollment Agreement unambiguously states that "the student will not be able to enroll at Trails Momentum until the documents are received." (Exhibit A at pg. 1). This created a false binary for Plaintiff: either sign the arbitration provision embedded within the required enrollment documents or face potential involuntary commitment proceedings. These circumstances epitomize the "bargaining naughtiness" that North Carolina courts have found constitutes procedural unconscionability. *Tillman*, 362 N.C. at 102-03, 655 S.E.2d at 370.

Moreover, the dramatic disparity in bargaining power between the parties further evidences procedural unconscionability. Plaintiff was merely 18 years old—legally an adult but developmentally vulnerable—while experiencing a mental health crisis when he signed the Agreement. (Compl. ¶¶ 93-95, 108, 166). In stark contrast, Defendants comprise a sophisticated network of corporate entities with a deliberately complex organizational structure, as evidenced by their multiple interlocking LLCs and management companies. (Compl. ¶¶ 17-56). This power imbalance was exacerbated by Defendants' material misrepresentations regarding the therapeutic services they purported to provide. (Compl. ¶¶ 93-104). Such misrepresentations prevented Plaintiff and his parents from accurately assessing the consideration they would receive in exchange for waiving fundamental legal rights through the arbitration agreement.

Turning to substantive unconscionability, the Agreement contains multiple harsh and one-sided provisions that unfairly benefit Defendants at Plaintiff's expense. Most egregiously, the

Agreement prohibits recovery of "exemplary or punitive damages." (Exhibit A, pg. 5, para. 19) This prohibition effectively immunizes Defendants from accountability for their most reprehensible conduct, which is precisely the type of conduct Plaintiff alleges in this case, including subjecting him to physical, sexual, and emotional abuse over a three-month period. (*See* Compl. ¶¶ 172-196). Such conduct, if proven, would unquestionably satisfy North Carolina's statutory standard for punitive damages, which permits such recovery where a defendant's conduct was marked by "fraud," "malice," or "willful or wanton conduct." N.C. Gen. Stat. § 1D-15(a). Moreover, this limitation extinguishes Plaintiff's statutory remedies under both North Carolina's consumer protection statutes and the Trafficking Victims Protection Reauthorization Act, which either provide or allow enhanced damages to deter precisely the type of predatory conduct alleged here. (*See* N.C. Gen. Stat. § 75-16; 18 U.S.C. § 1595).

The Agreement further prejudices Plaintiff by mandating the use of AAA expedited arbitration rules. These procedures are designed for modest claims under $75,000, not complex cases involving serious personal injury allegations exceeding $75,000.[1] These expedited rules severely restrict discovery and procedural protections in ways that systematically disadvantage Plaintiff. Under AAA's expedited procedures, "extensive discovery" and "the filing of motions or briefs" are permitted only in "extreme circumstances." *Id.*

This limitation creates a fundamentally unfair evidentiary asymmetry, as Defendants possess virtually all relevant evidence regarding their operations, policies, and treatment protocols. While Plaintiff has access to his own medical records, the critical evidence necessary to prove misrepresentation, fraud, and institutional negligence remains exclusively in Defendants' control.

---

[1] https://www.adr.org/sites/default/files/document_repository/Commercial%20Expedited%20Procedures%20Fact%2 0Sheet%20for%20Arbitrators.pdf (last visited April 20, 2025)

13

By constraining Plaintiff's access to this essential evidence, the expedited procedures effectively shield Defendants from meaningful accountability while limiting Plaintiff's ability to prove his claims. This is a paradigmatic example of substantive unconscionability.

The evidence demonstrates clear substantive unconscionability on the face of the Agreement. Discovery is essential to fully develop the factual record regarding the circumstances of the Agreement's execution before Plaintiff can be compelled to relinquish his fundamental right of access to the courts. Without discovery, the Court would be unable to properly evaluate the enforceability of an agreement that already exhibits hallmarks of unconscionability.

### 3. Defendants Obtained the Agreement Through Fraud

#### a. *Defendants Owed a Fiduciary Duty to Plaintiff*

The Agreement is invalid because Defendants obtained it through a breach of fiduciary duty to Plaintiff. A breach of fiduciary duty "constitutes fraud." *Link v. Link*, 278 N.C. 181, 192 (1971); *see also*, *King*, 369 NC. at fn.5. "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings*, *LLC*, 264 N.C. App. 350, 355 (2019). "In general terms, a [*de facto*] fiduciary relation is said to exist [w]herever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Vail v. Vail*, 233 N.C. 109, 114 (1951) (*internal quotation marks omitted*).

Fiduciary relationships are characterized by a "heightened level of trust and the duty of the fiduciary to act in the best interests of the other party." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014). As a result, "[w]here a relation of trust and confidence exists between the parties,

there is a duty to disclose all material facts and failure to do so constitutes" a breach of fiduciary duty. *Vail*, 233 N.C. at 114, 63 S.E.2d at 206 (*internal quotation marks omitted*). Liability for breach of fiduciary duty "is based on [the taking advantage of] a confidential relationship rather than a specific misrepresentation." *Barger v. McCoy Hillard Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997).

Under these principles, the North Carolina Supreme Court held in *King v. Bryant* that a physician had a *de facto* fiduciary relationship with his prospective patient at the time the prospective patient signed an arbitration agreement. *King*, 369 N.C. at 469. The court emphasized that this relationship existed because the patient "reposed trust and confidence" in the doctor due to the doctor's special knowledge and skill, even before treatment began. *King*, 369 N.C. at 466-67. Trust was exhibited by the patient providing the doctor's office with sensitive medical information before the first appointment. *King*, 369 N.C. at 466. The court recognized that this trust and confidence created responsibilities beyond those of ordinary contracting parties. *Id.*

Plaintiff and his parents chose Trails because of its specialized knowledge and skill in diagnosing and treating his severe and disabling depression and anxiety. (Compl. ¶ 93-94) Trails marketed itself to as having specialized knowledge and expertise in treating precisely those illnesses. (Compl. ¶ 85) ("Our tranquil and beautiful location is the perfect location for students to learn healthier ways to cope with **anxiety, depression** and other mental health and behavioral issues…") (emphasis added). Trails advertised itself as a "mental health and wellness program for young adults." (Compl. 82). On its website, Trails stated it combined "traditional therapeutic

approaches, such as individual, group, and family therapy, with more experiential learning opportunities…" to provide "comprehensive mental and behavioral healthcare…" [2]

Further, Trails required Plaintiff and his parents to provide Plaintiff's medical information to Defendants so that their "expert team [could] **get to know you and your background** in order to better assess your needs and goals." (emphasis added). *Id.* The Arbitration Agreement suggests this medical information was required for admission. (Exhibit A, pg. 1)

The required exchange of confidential information before treatment and Plaintiff and his parents' reliance on Trails' specialized knowledge is precisely the type of relationship where "confidence on one side results in superiority and influence on the other side," which is the defining characteristic of a fiduciary relationship. *King*, 369 N.C. at 464 (quoting, *Vail*, 223 N.C. at 114).

### b. Defendants Breached Their Fiduciary Duty to Obtain the Agreement

In *King*, the Supreme Court placed particular emphasis on how the doctor's representative presented the arbitration agreement to the patient. *King*, 369 N.C. at 465-66. The patient arrived for his initial appointment with the surgeon and was immediately handed several intake forms by the front desk employee. *Id.* The arbitration agreement was simply one document among many standard forms that all patients were required to complete before receiving treatment. *King*, 369 N.C. at 455-56. Critically, no one called the patient's attention to the arbitration agreement, distinguished it from the routine medical forms, or explained its legal significance. *Id.* The court found that presenting the agreement "in a collection of documents" created "the understandable impression that the arbitration agreement was simply another routine document" rather than one

---

[2] https://growatmomentum.com/ (last visited, April 21, 2025).

that "substantially affected his legal rights." Id. at 466-67. This manner of presentation, without any explanation of the document's significance, constituted a breach of the physician's fiduciary duty to the patient. *Id*.

As in *King*, the Agreement here was buried within the Enrollment Agreement that Plaintiff and his parents signed on March 1, 2021. (Exhibit A, pg. 5 of 7). The Enrollment Agreement is seven pages long. *Id.* It has 31 sections. *Id.* The purported arbitration agreement is section 19 of 31: it is buried right in the middle of the Enrollment Agreement. *Id.* The Enrollment Agreement has a single signature line at the end of page seven. *Id.* There are no sections for initials or any similar requirements that signatories acknowledge any individual sections of the Enrollment Agreement. *Id.*

The North Carolina Supreme Court in *King* looked beyond presentation in invalidating the arbitration agreement. The court noted the agreement was "poorly drafted, confusing, and nonsensical" for several specific reasons. *King*, 369 N.C. at 456-57, 795 S.E.2d at 344. First, it "repeatedly refer[ed] to arbitration without defining the term." *Id*. Second, it made "no mention whatsoever of the judicial process, a trial, or a jury." *Id*. Third, it included "no provision allowing or recommending that the patient consult with an attorney regarding the Agreement prior to signing it." *Id*. Fourth, the agreement did not "disclose Defendants' intent for Plaintiff King to waive his rights to the judicial process, including his right to a jury trial, in the event of any claim arising from or relating to the surgery." *Id*. The arbitration agreement in this case suffers from every one of these same deficiencies.

The Agreement relies on complex legal terminology without defining a single one. The Agreement uses terms like "non-binding mediation," "binding arbitration," "expedited arbitration rules," "arbitrator," "independently administered pursuant to AAA expedited arbitration rules" without explaining what these terms mean or even hinting at their significant legal consequences. (CITE). Nowhere in the Agreement do the words "jury," "trial," "court," "judge," or even "attorney" appear. *Id.* The Agreement provides no recommendation that Plaintiff consult with legal counsel before signing, despite its profound impact on his legal rights. *Id.* Most significantly, the

Agreement completely fails to disclose that by signing, Plaintiff would be waiving his constitutional right to have his claims heard in court before a judge and jury. *Id.* These are the exact deficiencies that led the court in *King* to find the arbitration agreement unenforceable.

The Agreement is facially unenforceable under *King*. Based upon the burying of the arbitration clause in the contract alone, the Court should deny Defendants motion. The Defendants bear the burden of establishing the existence of a valid arbitration agreement, and they must do so under the controlling North Carolina state contract law provided in *King*. *See, e.g.*, *Berkeley Cty. Sch. Dist.*, 944 F.3d at 236. Should the Court be inclined to believe that the Agreement may be enforceable under *King,* Plaintiff respectfully requests discovery into how the Agreement was presented to Plaintiff, what explanations were provided about its terms, whether Plaintiff was informed he was waiving his right to a jury trial, and whether Defendants took any steps to ensure Plaintiff understood the Agreement despite his vulnerable mental state, age, and education. *See, e.g., Ross v. Fin. Recovery Servs.*, 2022 U.S. Dist. LEXIS 20829, at *4 (W.D.N.C. Feb. 4, 2022). At the very least,   discovery is needed regarding these material facts that are essential to determining whether Defendants breached their fiduciary duty, which would render the Agreement unenforceable.

### 4.   The Arbitration Agreement is Unenforceable Due to Impossibility

While North Carolina has a general policy favoring arbitration, that policy is subject to "[t]he essential thrust of the Federal Arbitration Act, which is in accord with the law of our [S]tate, . . . to require the application of contract law to determine whether a particular arbitration agreement is enforceable[,] thereby placing arbitration agreements upon the same footing as other contracts." *Raper v. Oliver House, LLC*, 180 N.C. App. 414, 419, 637 S.E.2d 551, 554 (2006) (internal quotation marks and citation omitted); *see also Futrelle v. Duke University*, 127 N.C. App. 244, 248, 488 S.E.2d 635, 638 (1997) ("It is essential that parties to an arbitration specify clearly the scope and terms of their agreement to arbitrate as enforcement of arbitration agreements is not subject to less scrutiny than the enforcement of other agreements.").

A contract is unenforceable due to impossibility "if the subject matter of the contract is

destroyed without fault of the party seeking to be excused from performance." *Brenner v. Sch. House, Ltd.*, 302 N.C. 207, 210, 274 S.E.2d 206, 209 (1981). The AAA's policy of refusing to administer pre-dispute agreements between patients and healthcare providers renders such agreements dependent on AAA administration unenforceable as impossible to perform. *Crossman v. Life Care Ctrts. Of Am., Inc.*, 225 N.C. App. 1 (2013)

Effective January 1, 2003, 18 years before Plaintiff signed the Agreement, the AAA issued a Healthcare Policy Statement ("the Policy Statement") that informed all potential parties to an arbitration agreement arising in the field of healthcare that it would "no longer accept the administration of cases involving individual patients without a *post-dispute* agreement to arbitrate." Crossman, 225 N.C. App. at 1 (emphasis added). In *Crossman*, the court found the pre-dispute arbitration agreement unenforceable because it stipulated that arbitration must occur under the rules and procedures of AAA and be presided over by AAA arbitrators. *Id.*

Here, the Plaintiff signed the Arbitration Agreement before his dispute arose with Trails. (Exhibit A, pg. 7). The language of the agreement states that AAA rules shall apply, requiring that arbitration "shall be independently administered pursuant to the AAA expedited arbitration rules with one arbitrator if the parties can agree on one..." (*Id.*). While "independently administered" might suggest a non-AAA arbitrator, the requirement that administration be "pursuant to AAA expedited arbitration rules" necessarily implies AAA's involvement, creating an inherent contradiction when AAA refuses to administer such disputes.

This language creates an unresolvable ambiguity in the agreement. An agreement contains an ambiguity "when the writing leaves it uncertain as to what the agreement was." *Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 476 (2000). "[W]hen an ambiguity is present in a written instrument, the court is to construe the ambiguity against the drafter…" *Id.* (citing, *Station Assoc. Inc. v. Dare County*, 130 N.C. App. 56, 62 (1998)). The ambiguity should be read against Defendants as the drafters.

To be sure, Plaintiffs maintain that their claims are not under the purview of North

Carolina's medical malpractice statutes. However, Defendants marketed themselves as a therapeutic mental health facility to Plaintiffs and John, and as such, induced them all into the arbitration agreement under the guise of providing John with the mental healthcare that he desperately needed. This representation places the dispute squarely within the scope of AAA's policy concerning "disputes between patients and healthcare service providers," which AAA will "no longer accept the administration of cases involving individual patients without a *post-dispute* agreement to arbitrate." *Crossman*, 225 N.C. App. at 1 (*emphasis added*). The ambiguous Agreement is accordingly impossible to perform under current AAA rules and should be invalidated in its entirety.

Plaintiff has not been afforded an opportunity to establish defenses to the Arbitration Agreement. An in-depth evaluation of how the allegedly valid Arbitration Agreement was formed is necessary before the Court can examine its enforceability.

## CONCLUSION

Defendants' Motion to Dismiss is procedurally improper and should be denied. The Court has sufficient evidence before it to deny Defendants' Motion to Compel and to allow Plaintiff's claims to proceed. Defendants procured the unconscionable arbitration agreement through fraud and duress, and the agreement is facially impossible to perform under the AAA's 2003 Healthcare Policy Statement. Should the Court be inclined to further consider the validity of the Agreement, Plaintiff respectfully requests discovery into the circumstances surrounding the Agreement's formation to more fully develop his available defenses before being compelled to arbitrate.

Dated: April 21, 2025

Respectfully submitted,

Plaintiff by his attorneys,

/s/: Kimberly A. Dougherty
Kimberly A. Dougherty, Esq.
(admitted *pro hac vice*)
Keith Smith, Esq.
*(to be admitted pro hac vice)*
JUSTICE LAW COLLABORATIVE
210 Washington St.
North Easton, MA 0256
(508) 230-2700
kim@justicelc.com
keith@justicelc.com

And,

 /s/ Joel R. Rhine
RHINE LAW FIRM, P.C.
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
John Bruno, NCSB 54775
Email: jab@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 21st day of April, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of this electronic filing to all parties and or counsel of record in this action.

 /s/ Joel R. Rhine
RHINE LAW FIRM, P.C.
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
John Bruno, NCSB 54775
Email: jab@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062